UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                      :

EMA FINANCIAL, LLC,               :
                                        :

                       Plaintiff,    :                    

                                        :             17-CV-9706 (VSB)

          - against -          :

                                        :           **OPINION & ORDER**

JOEY NEW YORK INC., et al.,    :

                                        :

                     Defendants.  :

                                        :
--------------------------------------------------------X

<u>Appearances</u>:

Jeffrey Fleischmann
Law Office of Jeffrey Fleischmann, P.C.
New York, NY
*Counsel for Plaintiff*

Joey Chancis
Fort Lauderdale, FL

Richard Roer
Aventura, FL

Richard Chancis
Aventura, FL

*Pro Se Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

      Plaintiff EMA Financial, LLC ("EMA" or "Plaintiff") brings this action against seven

defendants ("Defendants"):  Joey Chancis, Richard Roer ("Roer"), Richard Chancis, (together,

the "Individual Defendants"), Joey New York, Inc., RAR Beauty, LLC ("RAR"), Labb, Inc.

("Labb"), and Reflex Productions, Inc. ("Reflex") (together, the "Corporate Defendants") for

breach of contract, breach of guaranty, fraudulent inducement, fraudulent conveyance, piercing

the corporate veil, specific performance, and compensatory and punitive damages.  Default judgment has already been entered as to liability against the Corporate Defendants.

With regard to the Individual Defendants, I granted Plaintiff's motion for summary judgment as to liability for breach of contract, breach of guaranty, and attorneys' fees; granted Plaintiff's motion to dismiss the counterclaim for fraudulent inducement; and denied Plaintiff's motion to dismiss the affirmative defenses.  I held a six-day bench trial on Plaintiff's remedies against the Individual Defendants and on the Individual Defendants' affirmative defenses.  With regard to the Individual Defendants, I find that judgment be granted in favor of Plaintiff as to breach of contract, breach of guaranty, and constructive fraudulent conveyance.  I further find that judgment is denied as to fraudulent inducement and actual fraudulent conveyance, and Plaintiff is not permitted to pierce the corporate veil.

With regard to damages, I find that Plaintiff is entitled to an award of $151,418.50 in compensatory damages, plus prejudgment interest accruing at 24% per year from July 26, 2017.  However, Plaintiff is not entitled to punitive damages or specific performance.

## I.      Procedural Background

Plaintiff filed this lawsuit against Joey Chancis and the Corporate Defendants on December 11, 2017.  (Doc. 1.)  On January 23, 2018, Joey Chancis and the Corporate Defendants filed their answer, which included a counterclaim for fraudulent inducement, (Doc. 18); they amended that answer and counterclaim on February 11, 2018, (Doc. 21).  On May 5, 2018, Plaintiff filed a motion and supporting documents for summary judgment on the causes of action for breach of contract, breach of guaranty, and attorneys' fees, and to dismiss the counterclaim and affirmative defenses raised by Joey Chancis and the Corporate Defendants.  (Docs. 23–26.)  Joey Chancis and the Corporate Defendants filed their response in opposition on

April 2, 2018, (Docs. 29–31), and Plaintiff filed its reply memorandum of law and supporting documents on April 16, 2018, (Docs. 34–36). On September 22, 2019, I granted Plaintiff's motion for summary judgment as to liability for breach of contract, breach of guaranty, and attorneys' fees; granted Plaintiff's motion to dismiss the counterclaim for fraudulent inducement; and denied Plaintiff's motion to dismiss the affirmative defenses. *EMA Fin., LLC v. Joey N.Y., Inc.*, No. 17-CV-9706 (VSB), 2019 WL 4600863 (S.D.N.Y. Sept. 22, 2019); (*see also* Doc. 38).

Plaintiff filed its First Amended Complaint on March 5, 2020. (Doc. 48.) In this amended complaint, Plaintiff added Roer and Richard Chancis as Defendants. (*Id.*) Defendants filed their answer to the amended complaint on April 20, 2020, (Doc. 55), which they amended on May 22, 2020, (Doc. 57). On August 17, 2020, the parties submitted their proposed joint pretrial order and proposed findings of fact and conclusions of law, (Docs. 60–61), in anticipation of a five-day bench trial that was subsequently scheduled for December 7, 2020, (Doc. 65). I held a final pre-trial conference with the parties on November 17, 2020. (Doc. 66.) On the eve of trial, Defendants' counsel Erica K. Doran ("Doran") filed a motion to withdraw, which I granted; I further adjourned the upcoming bench trial and stayed all deadlines in the case for about a month to allow for Defendants to seek new counsel. (Doc. 75.)

Since that time, the Individual Defendants have each represented themselves pro se. I denied the motions of Joey Chancis and Richard Roer to (1) file a motion to dismiss against Plaintiff, (Doc. 128), (2) file an amended counterclaim against Plaintiff, (*id.*), and (3) subpoena witnesses and re-open discovery, (Doc. 143). On May 24, 2021, in light of the fact that no attorney entered a notice of appearance on their behalf months after Doran withdrew from the case, I granted default judgment as to liability against the four Corporate Defendants. (Doc. 152.) On June 9, 2021, I granted Plaintiff's motion in limine to exclude Stephanie Cspeke from

being called as a witness for Defendants, and to exclude 80 exhibits annexed to Joey Chancis's

and Richard Roer's amended pretrial statement from being used as trial exhibits.  (Doc. 164.)  In

that order, I denied Plaintiff's motion in limine to prevent Defendants from asserting—at trial

and in post-trial briefing—an affirmative defense that the agreements at issue in this case should

be voided because Plaintiff was required to register as a broker-dealer.  (*Id.*)

I held five days of a bench trial in this case from June 14 to June 18, 2021.  The witnesses

were (1) Felicia Preston ("Preston"), Director of EMA, (2) Roer, (3) Joey Chancis, and (4)

Richard Chancis.  At the end of the trial day on June 18, 2021, I noted that I would keep the trial

record open to allow for the parties to submit certain materials and to allow for additional

testimony from Roer regarding some of these documents, as well as for closing arguments.  (Tr.

753:1-757:10.)[1]  On June 21, 2021, I directed the parties to produce various materials in advance

of the last trial day.  (Doc. 168.)  I held a sixth and final trial day on August 17, 2021.  (*See* Doc.

189.)  Joey Chancis and Roer, (Doc. 214), and Plaintiff, (Docs. 215–16), timely filed their post-

trial briefing on September 10, 2021.  Richard Chancis did not submit a post-trial brief or request

an extension of time to file such a brief.

## II.  <u>Findings of Fact</u>

### A.  *The Lead-Up to the Agreements*

Joey Chancis founded the private company Joey New York in 1993 with her late mother

Arlyne Roer.  (Tr. 269:23-270:2, 353:23-354:1.)  The company began as a creator and distributor

of skin care and cosmetic products.  (Tr. 269:23-270:2.)  The private company was profitable

within its first three years.  (Tr. 468:14-16.)  Around 2008 or 2009, Joey New York temporarily

---

[1] "Tr." refers to the transcripts from the bench trial conducted on July 14 through July 18, 2021 and August 17, 2021.  (Docs. 170, 172, 174, 176, 178, 198.)

ceased operations, though Joey Chancis and Roer—Joey Chancis's father—retained the company's intellectual property.  (Tr. 258:5-24, 353:5-354:1, 468:15-21.)  In 2010, Arlene and Richard Roer founded RAR, a similar company that manufactured and distributed beauty and skin care products.  (Tr. 188:12-189:11.)  Roer served as president of RAR until the Individual Defendants took their company public as Joey New York, Inc.  (Tr. 189:13-190:1.)  Roer was also co-president of Reflex, a division of RAR.  (Tr. 192:1-20.)  Until these companies went public, they were involved only in skin care and cosmetic and beauty products.  (Tr. 259:18-21.)

Around 2014, Joey New York went public under the name Joey New York, Inc.  (Tr. 537:21-538:16.)  Once the company went public, its business model changed to focus more on Botox procedures and other injectables.  (Tr: 259:22-260:3.)  On August 31, 2016, Joey New York, Inc. acquired 100% interest in two other companies:  RAR and The Labb.  (Doc. 209-1, at 9–10.)  Prior to this time, Reflex held a 51% interest in The Labb.  (*Id.* at 10.)  All of these companies and/or divisions of the companies were run out of Roer's apartment.  (Tr. 195:15-196:7.)  Around the time that the company went public, Richard Chancis, who was married to Joey Chancis, began working as a consultant for the public company, Joey New York, Inc.  (Tr. 538:17-14.)

Richard Chancis had previously pleaded guilty to one count of criminal conspiracy to commit securities fraud, mail fraud, and wire fraud, and was barred by Administrative Law Judge Robert G. Mahony from association with any broker or dealer under Sections 15(b) and 19(h) of the Securities Exchange Act of 1934.  (Doc. 60-19.)  It was Richard Chancis's idea to take the company public, and his core role was to help raise funds to expand the business.  (Tr. 190:23-191:5.)  Specifically, the purpose of taking the company public was to "raise money to acquire small beauty companies" and "[t]o open more Botox labs throughout the United States,"

goals that made it necessary for the company to raise money.  (*See* Tr: 210:21-25, 260:4-8,

471:16-473:16, 571:14-572:5.)  After Joey New York, Inc. acquired RAR and The Labb in 2016,

Joey New York, Inc. served as the parent company for RAR, which handled skin care products,

and for Reflex, which handled the injectables and Botox cosmetics labs.  (Tr. 676:17-677:6.)

In the lead-up to the Securities Purchase Agreements of February 1, 2017 (Doc. 60-1, the

"First SPA") and May 3, 2017 (Doc. 60-4, the "Second SPA"), (together, "the SPAs"), Preston

negotiated the business terms only with David Frommer ("Frommer") and Richard Chancis.  (Tr.

103:9-14, 104:11-17.)  Before signing the SPAs, Preston and Richard Chancis had several

conversations about the transactions at issue and the Corporate Defendants' business model.

(*See* Tr. 89:20-90:6, 129:15-130:7, 133:9-13.)  At some point during these conversations,

Richard Chancis provided Preston with a PowerPoint deck related to the businesses.  (Tr.

677:12-21.)  Preston subsequently learned about Chancis's felony conviction, (Tr. 115:20-

116:18), and had a conversation with him about it, (Tr. 117:1).  Preston and Richard Chancis

disagree as to whether Richard Chancis voluntarily told her about his felony conviction before

she discovered that information, (*compare* Tr. 116:23-117:4, *with* Tr. 671:21-672:14), but

Richard Chancis testified that Preston knew about his felony conviction before the parties

entered into the agreements, (Tr. 671:24-672:14).

During her conversations with Richard Chancis, Preston became aware that Joey New

York, Inc. did not have a positive cash flow.  (Tr. 681:4-9.)  Preston and Plaintiff also gathered

due diligence materials related to the Corporate and Individual Defendants before entering into

the agreements.  (*See* Doc. 180-19; *see also* Tr. 102:2-18.)  These due diligence materials

indicated that Joey New York, Inc. had received a similar loan for $385,000 from Peak One on

December 21, 2016—fewer than three months before the first Convertible Redeemable

Promissory Note at issue in this case.  (*See* Doc. 180-19, at 5.)  Preston also reviewed the public

filings of Joey New York, Inc. as part of the due diligence.  (Tr. 115:13-19, 113:17-25, 117:17-

118:14.)  Joey New York, Inc.'s 10Q public filing submitted on January 17, 2017—less than a

month before the parties signed the first Convertible Redeemable Promissory Note—showed that

The Labb, RAR, and Joey New York, Inc. were operating at a combined net loss of $285,752 for

the three-month period ending on November 30, 2016, and a combined net loss of $539,505 for

the six-month period ending on November 30, 2016.  (Doc. 209-1, at 11.)  The 10Q filing also

stated that on May 12, 2014, Joey New York, Inc. issued two promissory notes payable to Roer

and Joey Chancis for $1,500,000 each at an interest rate of 5%.  (*Id.* at 9.)  The 10Q filing further

stated that the promissory note was renewed at the same interest rate with a maturity date of May

12, 2017.  (*Id.*)

### B.   *The Agreements*

Plaintiff and Joey New York, Inc. entered into Securities Purchase Agreements on

February 1, 2017 (Doc. 60-1, the "First SPA") and on May 3, 2017 (Doc. 60-4, the "Second

SPA").  The First SPA provided for the purchase of a Convertible Redeemable Promissory Note

from Joey New York to Plaintiff for $90,000 (Doc. 60-1, the "First Note"), and the Second SPA

provided for the purchase of a Convertible Redeemable Promissory Note from Joey New York to

Plaintiff for $151,600 (Doc. 60-3, the "Second Note," and together with the First Note, the

"Notes").  The First Note was issued on February 1, 2017, (*see* Doc. 60-1), and the Second Note

was issued on May 3, 2017, (*see* Doc. 60-3).  All of these documents were executed to provide

Joey New York, Inc. with more capital to expand its in-store Botox and beauty treatment

business.

Other than the dollar figures, the relevant terms of the Notes are essentially identical.

Section 1.1 of the Notes provides:

> The Holder shall have the right, in its sole and absolute discretion, at any time from time to time, to convert all or any part of the outstanding amount due under this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion").

(Doc. 60-1 ¶ 1.1; Doc. 60-3 ¶ 1.1.)

The price for such conversion is the "lower of:  (i) the closing sale price of the Common Stock on the Principal Market on the Trading Day immediately preceding the Closing Date, and (ii) 65% of the average of the lowest two (2) sale prices for the Common Stock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding the Conversion Date or the closing bid price."  (Doc. 60-1 ¶ 1.2(a); Doc. 60-3 ¶ 1.2(a).)  If the borrower fails to deliver stock "issuable upon conversion of this Note . . . by the Deadline (as defined below) the Borrower shall pay to the Holder $1,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such" stock.  (Doc. 60-1 ¶ 1.2(c); Doc. 60-3 ¶ 1.2(c).)  "Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder, shall be added to the principal amount of this Note, in which event interest shall accrue thereon. . . ."  (Doc. 60-1 ¶ 1.4(g); Doc. 60-3 ¶ 1.4(g).)  Section 1.4(g) of the Notes state that "[t]he damages resulting from a failure [to convert] . . . are difficult if not impossible to quantify.  Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(g) are justified."  (*Id.*)

Article 3 of the Notes describes several events that would constitute events of default of the Notes.  (Doc. 60-1 ¶ 3; Doc. 60-3 ¶ 3.)  The Notes state that one of those default events is "[f]ailure to comply with the Exchange Act."  (Doc. 60-1 ¶ 3.9; Doc. 60-3 ¶ 3.9.)  Specifically,

the Notes provide, in part, that Defendants are in default if they "fail to comply in any material respect with the reporting requirements of the Exchange Act."  (*Id.*)

Article 3.16 describes the actions and procedures that are set in motion after a default event has occurred.  In the event of a default, the parties' obligations are also laid out in Article 3.16.  The Notes provide that "upon the occurrence of an Event of Default" as set forth in Article 3 of the contract—including failure to comply with the Exchange Act as set out at Article 3.9—other than mere failure to pay the principal as set out in Article 3.1:

> the Note shall become immediately due and payable and the Borrower shall pay to the Holder . . . an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment . . . plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

(Doc. 60-1 ¶ 3.16; Doc. 60-3 ¶ 3.16.)  Article 3.16 also states that "[i]f the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable," Plaintiff has "the right at any time, so long as the Borrower remains in default . . . to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect."  (*Id.*)  The Notes give Plaintiff the right to "convert any amounts due . . . until such time as the Note has been repaid in full."  (*Id.*)  The Notes each have a default interest rate of 24% per year.  (Doc. 60-1, at 1; Doc. 60-3, at 1.)  The Notes further provide that if Defendants default, they "shall pay the Holder hereof costs of collection, including reasonable attorneys' fees."  (Doc. 60-1 ¶ 4.5; Doc. 60-3 ¶ 4.5.)

### C.    *Defendants' Conduct After Entering into the Agreements*

When Joey New York, Inc. went public, Roer served as president and Joey Chancis served as CEO, while Richard Chancis did not hold an executive level position.  (Tr. 254:2-10.)

With the passage of time, Richard Chancis took on increasing responsibility for the public company, "running the financial end" of it and making decisions related to the company's day-to-day business, payroll, and hiring.  (Tr. 253:9-14, 254:11-25.)  Roer resigned from Joey New York, Inc. in March 2019.  (Tr. 291:23-292:7.)

   None of the Individual Defendants received a salary after the company went public, (Tr. 327:23-328:21 (Joey Chancis testifying that she never received a salary once Joey New York, Inc. went public); Tr. 529:6-7 (Richard Chancis testifying that none of the three Individual Defendants received a salary); 538:23-539:1 (similar); 545:7-10 (similar)), even though Roer and Joey Chancis had each previously invested $1.5 million of their personal funds into Joey New York, Inc. and Richard Chancis invested more than $1 million into the company, (*see* Doc. 209-1, at 9; Tr. 204:12-15, 545:12-20, 776:10-15).  Richard Chancis made the decision for the principals to forego salaries.  (Tr. 253:12-14.)  Joey New York, Inc. was never able to pay any portion of the Notes to Plaintiff, (Tr. 741:2-5), and it never turned a profit while a public company, (Tr. 204:10-15).

   The parties have stipulated as to hundreds of withdrawals, transfers, and other financial transactions that the Individual Defendants made from various corporate accounts since Plaintiff made its first loan to Defendants.  (*See* Doc. 60 ¶¶ 56–619.)  These transactions roughly fall into five categories.  First, there are instances where the Individual Defendants transferred money from the corporate accounts to their personal accounts in an effort to reimburse themselves after using the funds in the personal accounts for business expenses.  (*See* Tr. 206:14-19 (Roer testifying that Joey New York, Inc. may have paid for his personal expenses used for work-related issues "one or two times"); Tr. 220:25-221:12 (Roer testifying that he withdrew $5,000 from a corporate account to "pay [his] personal credit cards, which were used for company

business"); Tr. 225:25-226:16 (Roer testifying that he transferred a combined $55,000 from a corporate account to his personal account "[t]o pay off my credit cards, which were used to move the company along and pay off the credit card debts of the company, albeit in my name"); Tr. 227:25-228:7 (Roer testifying that he transferred a total of $7,500 from a corporate account to his personal account on May 17, 2017); Tr. 626:13-628:20 (Richard Chancis testifying that in March 2018 he made transfers of a combined $34,500 from one of the corporate accounts to his personal account likely to serve as "reimbursements" for business expenses he made from his personal credit card); Tr. 640:13-641:19 (Richard Chancis testifying that he transferred more than $28,000 to his personal accounts on June 13, 2018, likely to reimburse for a business expense.)  To this end, Defendants testified that they commonly used their personal accounts to pay for significant expenses on behalf of the corporate entities and would reimburse those personal accounts, often when the spending limits on those personal accounts had been reached. (*See* Tr. 221:4-12 (Roer testifying that some personal transfers were because his "personal credit cards . . . became maxed out after he used [them] for company business"); Tr. 282:10-283:9 (similar); Tr. 223:17-23, 226:3-16 (Roer testifying that he opened and possessed two corporate credit cards in his name which he used for business expenses); Tr. 726:9-17 (Richard Chancis testifying that he saw firsthand that Roer spent thousands of dollars on business expenses using his personal card); Tr. 782:21-783:18 (Roer testifying that he was not repaid the money that he lent to the company).)

The second category of stipulated transactions involve instances where the Individual Defendants transferred money between the various corporate accounts.  (*See, e.g.*, Tr. 206:23-210:13 (Roer testifying that a combined $67,000, (*see* Doc. 60-16, at 2), was transferred from Joey New York, Inc. to Reflex in early February 2018 to help expand the business); Tr. 221:17-

24 (Roer testifying as to another $40,000 transfer from Joey New York, Inc. to Reflex); Tr.

223:10-234:20 (Roer testifying about more transfers from Joey New York, Inc. to Reflex); Tr.

234:21-235:20 (Roer testifying about transfers from the Reflex account to the Joey New York,

Inc. account).)

Third, there were instances where the Individual Defendants withdrew money from the

various corporate accounts for what appear to be legitimate business purposes. (*See, e.g.*, Tr.

401:18-402:9 (Joey Chancis testifying about a $94.45 charge at a vitamin store that was used to

procure last-minute topicals needed for patients pre- and post-procedure); Tr. 415:23-416:13

(Joey Chancis testifying about a $195 charge for Botox and filler needed for last-minute

procedures); Tr. 604:21-605:7 (Richard Chancis testifying about buying more than $7,000 in

inventory).)

Fourth, there were instances where the Individual Defendants withdrew money from the

various corporate accounts for purposes that, at the very least, seem unusual for business

expenses[2] and perhaps skirted the line between business and personal. (*See, e.g.*, Tr. 379:10-

381:23 (Joey Chancis testifying that she spent nearly $300 from a corporate account to pay for

movie tickets and clothes for her assistant, who at the time was not adequately compensated); Tr.

391:17-392:20, 400:5-401:14 (Joey Chancis testifying that she spent a combined $139 on a

corporate card on multiple foot massages with a client over the span of a week); Tr. 420:12-

421:3 (Joey Chancis testifying that they withdrew nearly $280 in corporate monies for a dinner

to celebrate the business making an "It List" in a magazine); Tr. 402:10-403:7, 409:17-25,

415:11-21, 453:2-17, 457:14-22 (Joey Chancis testifying about spending hundreds of dollars in

---

[2] However, I note that certain of these expenses could be consistent with a business—like the Botox labs operated by Defendants—based on providing individuals with services with the promise of improving their appearance.

corporate monies toward getting her and her other employees' hair done in advance of public events or marketing opportunities for the companies).)

Fifth, there were instances where the Individual Defendants made transfers or withdrawals for which they testified they do not know the purpose.  (*See, e.g.*, Tr. 227:10-13, 241:17-21, 246:11-18 (Roer testifying that he cannot identify the purpose of any and all transfers from corporate accounts to a Barclays credit card); Tr. 418:13-419:6 (Joey Chancis testifying that she does not know the purpose of a $159.43 Apple Store charge on a corporate account); Tr. 635:5-636:16 (Richard Chancis testifying that he could not specifically account for nearly $12,000 in payments to his personal account in April 2018).)  Defendants provided few receipts indicating contemporaneous corroboration of the purpose of these transactions.  The Individual Defendants testified that they submitted receipts to Stephanie Cspeke, who was employed by the accounting firm that served as the SEC accountant for the corporate entities, (*see* Tr. 275:14-276:11; Tr. 682:12-684:15), but Defendants did not submit robust documentation to corroborate this process.

Joey New York, Inc. failed to submit Form 8(k) to the Securities and Exchange Commission ("SEC") on July 25, 2017, *EMA Fin., LLC*, 2019 WL 4600863, at *2, triggering the default provision in Article 3.9, (*see* Doc. 60-1 ¶ 3.9; Doc. 60-3 ¶ 3.9; *see also* (Doc. 180-2 (Plaintiff setting the "Default Date" for both Notes as July 25, 2017))).  On October 20, 2017 and on November 14, 2017, Plaintiff submitted Notices of Conversion to Joey New York.  *EMA Fin., LLC*, 2019 WL 4600863, at *2.  Joey New York, Inc. did not deliver the shares.  *Id.*

### D.  *Plaintiff's Conversions*

From August 9, 2017—approximately two weeks after the Default Date—to September 28, 2017, Plaintiff executed 35 conversions of Joey New York, Inc. stock, and sold 750,000

shares of the stock generating $182,515.84 in net sales proceeds.  (Doc. 207-1.)  From June 29,

2020 to February 12, 2021, Plaintiff made an additional 15 conversions of Joey New York, Inc.

stock, and sold 10,860,000 shares of the stock generating a net amount of $24,534.43.  (*Id.*)

Finally, from June 10, 2021 to July 7, 2021, Plaintiff made another 15 conversions of Joey New

York, Inc. stock, and sold 8,250,000 shares of the stock generating a net amount of $93,973.

(*Id.*)  In total, since the parties entered into the agreements, Plaintiff has sold 19,860,000 in

shares of Joey New York, Inc. stock, generating net proceeds of $301,023.27.  (*Id.*)  The amount

for these conversions, as determined by Article 1.2 of the Notes, was $82,507.50 for the first

Note and $7,674 for the second Note.  (Doc. 180-2.)

## III.   <u>Conclusions of Law</u>

I note as a preliminary matter that the Notes provide that they "shall be governed by and

construed in accordance with the laws of the State of New York."  (Doc. 60-1 ¶ 4.6; Doc. 60-3 ¶

4.6.)  Both parties apply New York law in their post-trial briefing, and no party indicates in their

post-trial briefing that New York law should not apply.  "Contractual choice of law provisions

are generally enforceable under both New York law and federal common law."  *Arnone v. Aetna

Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017).  As such, I apply New York law with regard to the

claims in this action.

### A.   *Breach of Contract and Breach of Guaranty*

On September 22, 2019, I granted summary judgment as to liability against the Corporate

Defendants and Joey Chancis on Plaintiff's claims for both breach of contract and breach of

guaranty.  *EMA Fin., LLC*, 2019 WL 4600863, at \*7.  Roer signed the Second Note, (*see* Doc.

60-3, at 18), and held an executive position for the corporate entities at all relevant times.

Richard Chancis took on increasing responsibility for the public company, "running the financial

end" of it and making decisions related to the company's day-to-day business, payroll, and

hiring.  (Tr. 253:9-14, 254:11-25.)  In 2019, Richard took over as president and CEO of the

company after Joey Chancis and Roer resigned.  (Tr. 15:11-13.)  Neither Roer nor Richard

Chancis argue that they should not be held liable for the contractual violations.[3]  As such, I enter

judgment for Plaintiff as to liability against Defendants on these two counts.

### B.     *Fraudulent Conveyance*

Plaintiff brings claims for constructive fraudulent conveyance under Debtor and Creditor

Law ("DCL") sections 273 and 275, and actual fraudulent conveyance under DCL section 276.[4]

I will discuss each theory of liability in turn below.

### 1.   Constructive Fraudulent Conveyance

#### a.   Applicable Law

There are "several situations . . . in which a transfer made without fair consideration

constitutes a fraudulent conveyance, regardless of the intent of the transferor."  *HBE Leasing*

*Corp. v. Frank*, 48, F.3d 623, 633 (2d Cir. 1995).  "Under the DCL, a conveyance by a debtor is

---

[3] I assume that, because Richard Chancis does not dispute he was contractually liable under the Notes, Plaintiff operates under the theory that he assumed the contractual obligations as the successor to Joey Chancis and Roer in his role of CEO and vice president.  *See TOT Payments, LLC v. First Data Corp.*, 9 N.Y.S.3d 44, 44 (2015) (successors took over the contractual obligations of the original signatories and were proper parties to the contract claims); *Golden Mountain Income, LLC v. Spencer Gifts, LLC*, 83 N.Y.S.3d 507, 509 (2018) (whether successor is liable for breach of contract of predecessor's contractual obligations is a question of fact).  This is also consistent with Richard Chancis's agreement to indemnify Joey Chancis and Roer for any damages stemming from this case.  (*See* Tr. 734:20-735:20 (Richard Chancis testifying about his agreement to indemnify Joey Chancis and Roer and explaining that he "was going to take on the financial responsibility if  [] either one of them was sued personally and were the subject of a personal lawsuit and personal damages were [] put on them"); 480:3-6 (Joey Chancis testifying about the marital settlement agreement in which Richard Chancis "agreed to indemnify myself and my father from any legal issues resulting from this business"); 490:25-491:5 (Joey Chancis testifying about Richard Chancis's agreement to indemnify Joey and Roer); 515:5-13 (same).)

[4] New York has amended these relevant portions of the DCL as they pertain to fraudulent conveyance since the commencement of this action.  2019 N.Y. AB 5622.  However, the statute provides that "[t]his act shall take effect one hundred twenty days after it shall have become a law," and that the new provision "shall not apply to a transfer made or obligation incurred before such effective date, nor shall it apply to a right of action that has accrued before such effective date."  *Id.*  Because the legislation became effective on April 4, 2020, and all the transfers at issue here occurred before that date, "the transfer at issue is governed by the prior provisions of the DCL."  *Bank Leumi USA v. GM Diamonds, Inc.*, No. 150474/2015, 2020 N.Y. Misc. LEXIS 4965, at *10 (N.Y. Sup. Ct. Aug. 26, 2020).

deemed constructively fraudulent if it is made without fair consideration and . . . if one of the following conditions is met:  (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275."  *In re Sharp Int'l Corp.*, 403 F.3d 43, 53 (2d Cir. 2005).

As the standard set out in *In re Sharp* makes clear, "[l]ack of fair consideration is an essential element of a claim pursuant to DCL §§ 273 and 275."  *Ray v. Ray*, No. 18 Civ. 7035 (GBD), 2019 WL 1649981, at *6 (S.D.N.Y. Mar. 28, 2019) (internal quotation marks omitted), *aff'd* 799 F. App'x 29 (2d Cir. 2020).  To establish "fair consideration," "(1). . . the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and (2) such exchange must be a fair equivalent of the property received; and (3) such exchange must be in good faith."  *In re Sharp*, 403 F.3d at 53 (internal quotation marks omitted).  While the "antecedent debt" refers to that of the debtor and not of the creditor, a debtor's "transfer to an affiliate or insider in satisfaction of an antecedent debt lacks good faith."  *Citibank, N.A. v. Benedict*, No. 97 Civ. 9541 AGS, 2000 WL 322785, at *13 (S.D.N.Y. Mar. 28, 2000) (internal quotation marks omitted).  In general, "the party challenging the conveyance" has "the burden of proving the lack of fair consideration."  *United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994) (internal quotation marks and alterations omitted).

b.  Application

I find that Defendants made some transactions at issue in this litigation without fair consideration.  At minimum, Defendants made many withdrawals and/or transfers from corporate accounts to their personal accounts, without any property exchanged in return.  (*See,*

*e.g.*, Tr. 220:25-221:12, 225:25-226:16, 640:13-641:19.)  The trial record also contains examples of the Individual Defendants using corporate monies to pay for massages with potential clients, (Tr. 391:17-392:20, 400:5-401:14), movies and shopping for their personal assistant, (*see* Tr. 379:10-381:23), dinner to celebrate a professional accomplishment, (*see* Tr. 420:12-421:6), and hair appointments for public relations purposes, (*see* Tr. 402:10-403:7, 409:17-25, 415:11-21, 453:2-17, 457:14-22).

Defendants argue that "all transfers of monies at issue in this case were for fair consideration, specifically good faith purchases for (or reimbursement for purchases for) the business of expanding the aforementioned beauty clinics and/or discharges of antecedent debts." (Doc. 214, at 34 (noting also that the Individual Defendants are owed "large sums of money . . . for unpaid salary as well as equity").)  Defendants misunderstand the concept of "fair consideration."  The question is not whether the Individual Defendants had fair consideration for these transactions based on their own dealings with Joey New York, Inc., but rather whether Joey New York, Inc. had fair consideration for the relevant transfers and withdrawals based on the public company's outstanding debts to Plaintiff.  At trial, (1) Plaintiff established that money was transferred out of the corporate accounts and into the Individual Defendants' personal accounts, and (2) the Individual Defendants confirmed that these transactions were not for anything of value or to discharge any antecedent debts of Joey New York, Inc.  To the extent that Defendants argue that these transfers of corporate monies were used to pay off the company's debts owed to the Individual Defendants, this argument must fail because this would constitute "transfer[s] to an affiliate or insider in satisfaction of an antecedent debt," which are impermissible to satisfy fair consideration.  *Citibank*, 2000 WL 322785, at *13.[5]  If I adopted Defendants' interpretation

---

[5] This argument would also fly in the face of the Individual Defendants' own testimony that they have not been

of fair consideration, the Individual Defendants would have free rein to use Plaintiff's money merely because they as insiders were purportedly owed money from Joey New York, Inc. Such an interpretation would render useless the legal concept of fair consideration.

"For purposes of the DCL, a person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." *In re Nine West LBO Sec. Litig.*, 505 F. Supp. 3d 292, 319 (S.D.N.Y. 2020) (internal quotation marks omitted). "The operative reference point for determining insolvency is the time at which the transfer took place." *Kim v. Yoo*, 311 F. Supp. 3d 598, 612 (S.D.N.Y. 2018), *aff'd*, 776 F. App'x 16 (2d Cir. 2019). Defendants concede that they were insolvent at the time they entered into the agreements and for months after they entered into those agreements. (Doc. 214, at 40–41.) This conclusion is also borne out in the trial record. (*See* Tr. 204:10-15 (noting that the public company never earned a profit); 681:4-9 (noting that all parties knew that the public company did not have a positive cash flow); Doc. 209-1, at 11 (Joey New York, Inc.'s January 2017 10Q filing showing that the company was operating at a significant net loss).)

Given that Defendants were insolvent at all relevant times, and they conducted transactions without fair consideration, I award judgment to Plaintiff for its constructive fraudulent conveyance claim. However, I note that Plaintiff—despite having stipulated with Defendants with regard to the bank records showing the flow of funds among the various corporate and personal account of Defendants—does not identify which of the hundreds of transactions at issue it believes are constructive fraudulent conveyances. Given that it is Plaintiff's burden to prove its fraudulent conveyance claim by submitting evidence regarding the

---

repaid for any of their personal loans to, or investments in, the corporate entities. (*See* Tr. 777:5-7, 782:21-783:18.)

fraudulent transactions, I decline to identify a list of the transactions that constitute constructive fraudulent conveyance. *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (to assert a constructive fraud claim, plaintiff must prove, by a preponderance of the evidence, "(1) a conveyance (2) without fair consideration (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer"); *Palmerone v. Staples*, 150 N.Y.S.3d 723, 726 (2d Dep't 2021) (summary judgment on fraudulent conveyance claim granted to plaintiffs who presented evidence identifying the specific fraudulent property involved in the transactions); *Med. Arts-Huntington Realty, LLC v. Meltzer Rosenberg Dev., LLC*, 52 N.Y.S.3d 382, 384–85 (2d Dep't 2017) (same).

### 2.   Actual Fraudulent Conveyance

#### a.   Applicable Law

DCL section 276, unlike sections 273 and 275, "addresses actual fraud, as opposed to constructive fraud, and does not require proof of unfair consideration or insolvency." *Wall Street Associates v. Brodsky,* 684 N.Y.S.2d 244, 247 (1st Dep't 1999).  "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  *Id.* (internal quotation marks omitted).  "Badges of fraud may include, *inter alia*, 'a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; the transferor's knowledge of the creditor's claim and the inability to pay it; and retention of control of the property by the transferor after the conveyance.'"  *Ray*, 799 F. App'x at 32 (quoting *Brodsky,* 684 N.Y.S.2d at 248).

#### b.   Application

Plaintiff is correct that some of these badges of fraud exist here, (*see* Doc. 215, at 101–102), including a close relationship between the parties and inadequate capitalization at the time of the transfers.  However, badges of fraud are insufficient where, as here, Defendants have "presented evidence suggesting [their] actual intent was not to deceive present or future creditors."  *Field Home-Holy Comforter v. Warns*, No. 12 CV 9285(VB), 2014 WL 7398904, at *5 (S.D.N.Y. Dec. 13, 2014).  It is telling that Plaintiff relies only on badges of fraud and fails to point to any trial testimony indicating that any Defendants actually intended to defraud Plaintiff.  As discussed in greater detail in the sections on fraudulent inducement and piercing the corporate veil, the record evidence and testimony—which Plaintiff failed to contradict with any specific evidence of its own—show that Individual Defendants never received any salary, (Tr. 529:6-7), each invested more than $1 million in the company, (Doc. 209-1, at 9; Tr. 204:12-15, 545:12-20), and overwhelmingly made these transfers and withdrawals in order to pay company expenses.  Even where the Individual Defendants transferred money from the corporate account to their personal accounts, they did so to reimburse those personal accounts after they were used for business expenses.  (*See, e.g.*, Tr. 220:25-221:12, 225:25-226:16, 626:13-628:20.)  There is simply nothing in the trial record to support Plaintiff's theory:  that Defendants withdrew money from the corporate accounts in an attempt to prevent Plaintiff from recovering on its loans.  Absent any evidence to this effect, Plaintiff's actual fraudulent conveyance claim clearly fails.

### C.    *Fraudulent Inducement*

#### 1.  Applicable Law

"[I]t is well-settled in New York that where a party is fraudulently induced to enter into a contract, the contract is voidable at the instance of the defrauded party."  *Compunnel Software Grp., Inc. v. Gupta*, No. 14-CV-4790 (RA), 2018 WL 4757941, at *8 (S.D.N.Y. Sept. 30, 2018)

(internal quotation marks omitted).  "To state a claim for fraudulent inducement under New York law, a plaintiff must allege: '(1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury.'" *Kainz v. Bernstein*, 841 F. App'x 249, 251 (2d Cir. 2020) (summary order) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005)).  In determining whether a plaintiff reasonably relied, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp. Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

### 2.  Application

Plaintiff appears to argue that Defendants made two types of fraudulent representations.  Neither argument is remotely convincing.  First, Plaintiff argues that Defendants "falsely represent[ed] to [Plaintiff] that [Joey Chancis] intended to use the funds obtained from EMA to finance [her] expansion of storefront Botox and beauty clinics throughout the State of Florida, New York, and California."  (Doc. 215 ¶ 611.)  In its briefing, Plaintiff provides no evidence, from the trial record or otherwise, that these representations were untrue when Defendants made them.  By contrast, Defendants provided consistent, unrefuted testimony at trial that they intended, albeit unsuccessfully, to expand Joey New York, Inc. and open stores around the country, including in those states.  (*See, e.g.*, Tr. 210:21-25 (Roer testifying that "[t]he reasons that monies were borrowed from EMA was to expand the Joey New York company, expand it by opening more locations, more Botox locations throughout the United States.  That's the reason why the money was borrowed."); Tr. 260:4-8 (Roer testifying that they went public "[t]o open

more Botox labs throughout the United States and also to think about franchising the name and

have other company-owned locations," and that they "needed more funding" to do so); Tr.

471:16-473:16 (Joey Chancis testifying that the initial "purpose" for the company going public

was, in part, "to raise money to acquire small beauty companies," and that upon receiving

funding, they planned to open multiple Botox labs in southern Florida and Los Angeles); Tr.

571:14-572:5 (Richard Chancis testifying that they intended to expand Joey New York, Inc., and

as a result they "decided to tap the capital markets to fuel [the] expansion" in part because they

anticipated that the expansion would cost "millions of dollars").)  The fact that Defendants may

have "failed to open a single additional store since [they] obtained financing from [Plaintiff]" is

irrelevant; Plaintiff provides no basis for its leap that somehow this fact means "Defendants

never intended to use the funds for this purpose."  (Doc. 215, at 105.)

     Second, Plaintiff argues that Defendants "pretended that [Joey] Chancis and Roer were

running the Corporate Defendants" as opposed to Richard Chancis, under the theory that

"[Plaintiff] and other investors would not invest in a publicly traded company that was run by a

felon who had been convicted of securities fraud."  (*Id.* at 104.)  It is remarkable that Plaintiff

would continue to make this argument in light of the trial testimony.  Contrary to Plaintiff's

suggestion that Defendants hid the involvement of Richard Chancis in the company, Preston

herself testified that she engaged in several direct conversations with Richard Chancis in

connection with the transactions at issue here, (Tr. 89:20-90:6), that she believed that she

negotiated the business terms of the Notes only with Frommer and Richard Chancis, (Tr. 103:12-

104-1), that she discussed Joey New York, Inc.'s business model with Richard Chancis on

multiple occasions, (Tr. 129:15-130:7), and that Richard Chancis informed her that the three

Individual Defendants were putting their own money into the company, (Tr. 133:9-13).  Further,

Preston testified that, in doing her due diligence, she found that "there was something on Richard Chancis' record" and that, "at some point in time, it was brought to our awareness that there was an investigation of some kind of disciplinary action against Richard Chancis," though she did not recall whether she became aware of that before or after entering into the agreements with Defendants.  (Tr. 115:20-116:18.)  Although Preston and Richard Chancis disagreed as to whether the latter voluntarily disclosed the information about his felony conviction, (*compare* Tr. 116:23-117:4, *with* Tr. 671:21-672:14), Preston acknowledged that she "had a conversation" with Richard Chancis after she found out about his felony conviction, (Tr. 117:1).  Preston further testified that she was under the impression that Richard Chancis was "running the Florida location and helping with the expansion."  (Tr. 130:10-12.)  In other words, Preston admitted that she had extensive discussions with Richard Chancis before entering into the agreements, that she was aware that he played a prominent role with the company's operations and proposed expansion, and that she spoke with him directly about his felony conviction.  Finally, Plaintiff and Preston do not meaningfully contest Richard Chancis's testimony that he "completely disclosed" his felony status to Preston before they entered into their agreements, and that "[s]he was quite clear that she knew" about his felony conviction before they entered into the agreements.  (Tr. 671:21-672:14.)

In addition, the trial testimony does not establish that Richard Chancis "ran" the company, as opposed to Joey Chancis and/or Roer.  The unrebutted testimony shows that, until he stepped down in March 2019, Roer ran "operations on the business side," which meant "executing everything and anything that needed to be done," while Joey Chancis handled marketing, promotion, and supervising several locations.  (Tr. 470:17-22, 472:7-473:6.)  Although it is true that Richard Chancis made significant decisions related to the company's

finances, the trial testimony does not support the idea that he ran the company while Joey

Chancis and Roer were mere figureheads or underlings. Rather, the trial testimony makes clear

that the three principals were each responsible for running different aspects of the business.

Plaintiff elicited no testimony at trial to support either theory that Defendants made false

representations in an effort to induce Plaintiff into entering into the agreements. Moreover,

Plaintiff's argument that it deserves punitive damages on this claim because Defendants' conduct

was "intentional, egregious, wanton, malicious, fraudulent, [and] shocking to the conscience" is

plainly at odds with the record in this case and entirely without merit. *See infra*.

### D.    *Piercing the Corporate Veil*

#### 1.   Applicable Law

"New York law establishes two requirements to pierce a corporate veil and to hold an

individual liable for corporate action: (1) the person must dominate the corporation, effectively

dictating its action, . . . and (2) the person must use that control to abuse the privilege of doing

business in the corporate form by perpetrating a wrong or injustice against the plaintiff such that

a court in equity will intervene." *Badian v. Elliott*, 165 F. App'x 886, 889 (2d Cir. 2006)

(summary order) (citations and internal quotation marks omitted). "Although a showing of

complete domination is the key to piercing the corporate veil, the party seeking to pierce the

corporate veil must also fulfill the second requirement by demonstrating: 1) the existence of a

wrongful or unjust act toward that party, and 2) that the act caused that party's harm." *JSC*

*Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461,

465 (S.D.N.Y. 2005) (internal quotation marks omitted). In assessing the first factor—that the

Defendants dominate the corporation—courts consider many factors, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3)
> intermingling of funds; (4) overlap in ownership, officers, directors, and personnel;

(5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

## 2. Application

Plaintiff clearly has satisfied the first element of the piercing the corporate veil analysis. The public company was inadequately capitalized—it never earned a profit, (Tr. 204:10-15), and the Individual Defendants made clear that they struggled to find funding, (*see* Tr. 572:23-573:17), and were so cash-strapped that they at times did not have the money to pay some of their employees, (*see* Tr. 379:15-20), and often scrambled to make last-minute payments just to pay for daily supplies, (*see* Tr. 401:18-402:9, 415:23-416:13, 604:21-605:7).  All the corporate entities had essentially the same principals and were run out of Roer's apartment.  (Tr. 195:15-196:7.)  Most importantly, this is almost a textbook case of corporate entities disregarding corporate formalities and intermingling funds.  As noted *supra*, the trial record is replete with evidence that Defendants:  (1) made, at minimum, hundreds of withdrawals, transfers, and other financial transactions from their corporate accounts for which they have provided barely any documentation, (2) transferred large sums of money between their various corporate entities whenever they felt it necessary, (*see, e.g.*, Tr. 206:23-210:13, 221:17-24, 223:10-234:20, 234:21-235:20), and (3) transferred large sums of money to their personal accounts to pay off personal credit cards, (*see, e.g.*, Tr. 221:4-12, 282:10-283:9, 626:13-628:20, 726:9-17).  For example, Roer testified that he was the company's "personal line of credit."  (Tr. 221:4-12.)  The Individual Defendants, in other words, freely mixed personal and corporate monies on a near-daily basis.  Therefore, I find that the Individual Defendants dominated Joey New York, Inc.

Nevertheless, Plaintiff failed to establish that Defendants perpetrated a wrong or injustice in violation of the second element. "[T]hose seeking to pierce a corporate veil bear a heavy burden." *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 235 (N.Y. 2011) (citation omitted); *see also Am. Federated Title Corp. v. GFI Mgmt. Servs.*, 126 F. Supp. 3d 388, 402 (S.D.N.Y. 2015) ("New York courts have made clear that the veil-piercing standard is demanding."). "[O]nly intentionally deceptive or intentional and unjust acts justify piercing the corporate veil." *Am Federated Title Corp.*, 126 F. Supp. 3d at 403 (internal quotation marks omitted). There is nothing in the trial record to suggest that the Individual Defendants acted in an "intentionally deceptive or intentional and unjust" way. Despite Plaintiff's unsupported assertions, far from lining their pockets, the Individual Defendants presented unrebutted evidence that they never received a salary at any time, (Tr. 529:6-7), and each invested more than $1 million into the company, (Tr. 204:12-15, 545:12-20). Most notably, Roer holds a promissory note from the company for all the personal money he put into the company, but he has not received any of the $1.5 million plus interest he is owed on that note. (Tr. 777:5-7, 782:21-783:18.) The Individual Defendants consistently testified that they transferred monies from the corporate accounts to their personal accounts only to reimburse themselves for business expenses that they put on their personal cards. (*See, e.g.*, Tr. 221:4-12, 225:25-226:16, 726:9-17.) The vast majority of the corporate expenses discussed at trial were reasonable business expenses—whether for supplies, (*see* Tr. 401:18-402:9), food and refreshments for clients or investors, (*see* Tr. 241:5-16), or for business meetings at restaurants, (*see* Tr. 465:10-20), where Defendants often held meetings because they did not have enough money for office space, (*see* Tr. 387:1-6). Even where Defendants were unable to remember exactly what the charges were for, they consistently testified that they did not use corporate monies for personal purposes.

As noted *supra*, Plaintiff has pointed to a handful of expenses that likely fall on the wrong side of the line between business and personal—such as multiple massages in a single week with potential clients, (Tr. 391:17-392:20, 400:5-401:14), or movies and shopping to thank their personal assistant because they could not afford to pay her a salary, (*see* Tr. 379:10-381:23).  However, these expenses are a mere drop in the bucket as compared to the millions of dollars the Individual Defendants put into the company and the fact that they did not receive salaries for years.  I also credit the Defendants' testimony concerning their desire to grow the business, and that testimony is consistent with Defendants' use of substantial sums of their own money to fund and prop up the business.

While I find that Defendants are liable for breach of contract and guaranty, "a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil."  *Skanska USA Bldg. Inc. v. Atlantic Yards B2 Owner, LLC*, 40 N.Y.S.3d 46, 54 (1st Dep't 2016).  Although I found *supra* that Defendants are also liable for constructive fraudulent conveyance, Plaintiff has not cited—and I have not found—any authority suggesting that this finding of liability requires me to permit Plaintiff to pierce the corporate veil in this case.  Instead, I see no evidence that Defendants "used [their] control to . . . place assets beyond the reach of creditors or otherwise avoid obligations."  *Hamlen v. Gateway Energy Servs. Corp.*, No. 16 Civ. 3526 (VB)(JCM), 2017 WL 6398729, at *10 (S.D.N.Y. Dec. 8, 2017).  The trial record reveals that Individual Defendants disregarded corporate formalities and comingled funds not because they were trying to enrich themselves at Plaintiff's expense, but because they were completely in over their heads having imprudently taken Joey New York, Inc. public and then found themselves desperately trying to salvage a capital-intensive and failing company.  Today, the Individual Defendants—Roer in particular—are financially ruined.  (*See* Tr. 292:2-20 (Roer

testifying that he is "out of money," had to give up his apartment and car, and has no computer),

293:9-294:5 (Roer testifying that he has been forced to sell his clothing, jewelry, artwork, and

wedding band because his Social Security payments are "not enough to support [him] at all"),

479:8-17 (Joey Chancis testifying about her financial situation).)  Therefore, I see no reason to

exercise my equitable authority to permit Plaintiff to pierce the corporate veil here, where there

is no evidence of any intentionally deceptive or intentional and unjust behavior at issue.

> **E.**     *Remedies*

> **1.  Constructive Fraudulent Conveyance**

While I have granted judgment for Plaintiff as to liability for breach of contract, breach of

guaranty, and constructive fraudulent conveyance, I find that Plaintiff is entitled only to

contractual damages and not damages related to its fraudulent conveyance claim.  I make this

determination for two reasons.  First, "[a] plaintiff seeking compensation for the same injury

under different legal theories is of course only entitled to one recovery."  *Indu Craft v. Bank of*

*Baroda*, 47 F.3d 490, 497 (2d Cir. 1995); *see also Martilet Mgmt. Servs., Inc. v. Bailey*, No. 12

Civ. 6691(PAC), 2013 WL 5420966, at *5 (S.D.N.Y. Sept. 27, 2013) (finding that "[t]he Court

need not address" plaintiff's fraud claim "because Plaintiff has prevailed on its contract claim for

the same relief.").  "In such cases where a Plaintiff is seeking compensation for the same injury

under multiple theories, the proper measure of damages is the one that represents the greater

recovery."  *CAMOFI Master LDC v. Riptide Worldwide, Inc.*, No. 10 Civ. 4020(CM)(JLC), 2012

WL 6766767, at *13 (S.D.N.Y. Dec. 17, 2012) (internal quotation marks omitted).  Here, I find

that Plaintiff is entitled to $151,418.50 plus prejudgment interest in damages for its contractual

claims, *see infra*, but Plaintiff fails to put forth a recovery estimate for its fraud claims, (*see* Doc.

215 ¶ 623).  Therefore, I find that Plaintiff's breach of contract damages would provide the

greater recovery, meaning that Plaintiff should recover only for that claim.  Plaintiff provides no authority for its argument that its damages should be "additive" across multiple claims.  (*See* Doc. 216, at 21.)

Second, I find that Plaintiff cannot recover for fraudulent conveyance because it failed to establish at trial the amount of damages.  Plaintiff appear to argue that it is entitled to recovery for both fraudulent conveyance and breach of contract damages because the method of calculating damages for the two claims is different.  (*See* Doc. 215 ¶¶ 623–629.)  Even if this were true, Plaintiff failed to prove at trial, or make clear in post-trial briefing, the amount of damages to which Plaintiff is entitled on its fraudulent conveyance claims.  As noted *supra*, the parties stipulated to the admissibility of the financial records evidencing hundreds of withdrawals, transfers, and other financial transactions that Defendants made after the Notes went into effect.  (*See* Doc. 60 ¶¶ 56–619.)  At trial, and in its post-trial briefing, Plaintiff failed to establish which of these hundreds of transactions constitute fraudulent conveyances and, accordingly, failed to quantify the damages Plaintiff is owed.  As such, "Plaintiff[] [has] not met [its] evidentiary burden to prove the amount of unlawfully conveyed property with reasonable certainty so as to permit the Court to award damages."  *CAMOFI Master LDC*, 2012 WL 6766767, at *15.  Although the Court in *CAMOFI* ordered plaintiff to submit "a more detailed evidentiary showing of damages specifically attributable to fraud and fraudulent conveyance," that case was at the default judgment stage.  *See id.*  At this point, Plaintiff is not entitled to submit such evidence, because Plaintiff had a clear opportunity to do so at the bench trial in this case.

## 2.  Contractual Damages

I find that Plaintiff is entitled to $151,418.50 for its contractual claims, plus prejudgment

interest accruing at 24% per year from July 26, 2017, the date after Defendants defaulted. "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *LG Capital Funding, LLC v. Cardiogenics Holdings, Inc.*, 787 F. App'x 2, 3 (2d Cir. 2019) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003)); *see also Indu Craft*, 47 F.3d at 495 ("[T]he general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract."). Under the Notes, Defendants owed a total of $241,600—$90,000 on the First Note and $151,600 on the Second Note. (*See* Doc. 60-1; Doc. 60-3.) By Plaintiff's own calculation, it converted a total of $90,181.50 of that principal into shares of Joey New York, Inc. common stock after the July 25, 2017 default date— $82,507.50 on the First Note and $7,674 on the Second Note. (*See* Doc. 180-2; Tr. 37:1-6, 39:20-23; Doc. 60-1 ¶ 3.16 (stating that, "so long as the Borrower remains in default," Plaintiff has "the right at any time . . . to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.").) The difference between $241,600 (the total principal of the loans Plaintiff made to Defendants) and $90,181.50 (the amount of the principal Plaintiff converted into shares post-default) is $151,418.50. The contract further provides that any unpaid principal shall accrue 24% interest per year, meaning that Plaintiff is also owed prejudgment interest from July 26, 2017—the date of default—until the date of judgment, at 24% per year.

After trial, I directed Plaintiff to address in its post-trial briefing whether it was "seeking liquidated damages" and, if so, the amount it was seeking and the basis for that request. (Doc.

191 ¶ 9.)  In response, Plaintiff answered that "[it] is not seeking liquidated damages."  (Doc. 216, at 28.)  By Plaintiff's own admission, then, Plaintiff should only be entitled to receive the actual damages that I have just laid out related to its contractual claims.  However, Plaintiff's proposed damages calculations would award Plaintiff $572,104.83—in large part because they appear to take into account Articles 1.4(g) and 3.16 provided in the two Notes.  (*See* Doc. 180-2; Doc. 215 ¶¶ 624–28.)

I find that Articles 1.4(g) and 3.16 are both invalid liquidated damages provisions such that Plaintiff cannot recover under those provisions.  "[A] liquidated damages provision is an estimate made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement."  *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (internal quotation marks omitted).  "[C]ourts will uphold and enforce liquidated damages provisions where (1) actual damages are difficult to determine and (2) the amount of damages awarded pursuant to the clause is not clearly disproportionate to the potential loss."  *Adar Bays, LLC v. GeneSYS ID, Inc.*, 341 F. Supp. 3d 339, 349 (S.D.N.Y. 2018) (citation omitted).

As noted *supra*, Articles 1.2(c) and 1.4(g) require Defendants to provide Plaintiff with $1,000 per day, plus interest, for each day that Defendants failed to timely deliver the common stock to Plaintiff.  Article 1.4(g), on its face, refers to itself as a "liquidated damages provision" (*see* Doc. 60-1 ¶ 1.4(g); Doc. 60-3 ¶ 1.4(g)), and attempts to set out a damages estimate in the event that Defendants breached the contract and failed to deliver stock.  Courts in this Circuit have routinely determined that these "daily payment provisions" constitute liquidated damages provisions.  *See, e.g.*, *LG Capital Funding, LLC v. 5Barz Int'l*, 307 F. Supp. 3d 84, 102 (E.D.N.Y. 2018); *Adar Bays, LLC v. 5Barz Int'l, Inc.*, No. 16 Civ. 6231 (NRB), 2018 WL

3962831, at \*13–14 (S.D.N.Y. Aug. 16, 2018); *LG Capital Funding, LLC v. Coroware, Inc.*, No.

16 Civ. 2266 (AMD) (PK), 2017 WL 3973921, at \*3 (E.D.N.Y. Sept. 8, 2017); *L & L Wings,*

*Inc. v. Marco-Destin, Inc.*, 756 F. Supp. 2d 359, 364 (S.D.N.Y. 2010); *Laurus Master Fund, Ltd.*

*v. Versacom Int'l, Inc.*, No. 02Civ.5340(LTS)(MHD, 2003 WL 21219791, at \*5 (S.D.N.Y. May

21, 2003). Courts have found that "actual damages for the failure to honor a notice of

conversion are not difficult to calculate," because courts can simply "subtract[] the contract

price—the price at which the plaintiff is entitled to convert shares under the Note—from the

market price of the shares on the date of the breach." *Adar Bays*, 2018 WL 3962831, at \*10

(internal quotation marks omitted); *see also LG Capital Funding, LLC  v. 5Barz Int'l*, 307 F.

Supp. 3d at 102 (similar). Courts have also consistently found that daily fee provisions of

$250/day and $500/day—less than the $1,000/day provision provided for in Article 1.4(g)—are

"clearly disproportionate to the potential loss" that arises from Defendants failing to timely

deliver the shares. *Id.*; *see also Adar Bays*, 2018 WL 3962831, at \*13 ("[I]n this case, the

liquidated damages provision is *per se* disproportionate because it bears no relationship to actual

losses.") (citation omitted); *Coroware*, 2017 WL 3973921, at \*3 ("The daily penalty functions as

just that—a penalty; the amount is not tethered to the plaintiff's actual losses, and serves only to

coerce contract performance."). As such, "like other courts in this circuit," I "conclude[] that the

daily penalty provisions are unenforceable, and damages thereunder are denied." *LG Capital*

*Funding, LLC Capital v. 5Barz Int'l*, 307 F. Supp. 3d at 102 (collecting cases).

Article 3.16 provides detailed procedures for what happens when the borrowers default.

(Doc. 60-1 ¶ 3.16; Doc. 60-3 ¶ 3.16.) When a default event occurs, the Notes require that:

> the Note shall become immediately due and payable and the Borrower shall pay to
> the Holder . . . an amount equal to the greater of (i) 150% times the sum of (w) the
> then outstanding principal amount of this Note plus (x) accrued and unpaid interest
> on the unpaid principal amount of this Note to the date of payment . . . plus (y)

> Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

(Doc. 60-1 ¶ 3.16; Doc. 60-3 ¶ 3.16.)  Like Article 1.4(g), Article 3.16 is a provision that

attempts to set out a formula for damages in the event that Defendants breached the contract.

Courts in this Circuit have determined that similar "multiplier provisions" requiring the defaulted

borrower to pay 150% or 200% of the amount owed constitute liquidated damages provisions.

*See LG Capital Funding, LLC v. One World Holding, Inc.*, No. 15-CV-698 (SJ)(JO), 2018 WL

3135848, at *13–14 (E.D.N.Y. June 27, 2018); *LG Capital Funding, LLC v. MineralRite Corp.*,

No. 16 Civ. 6158 (PKC) (VMS), 2017 WL 9250297, at *11 (E.D.N.Y. Dec. 1, 2017).  Here,

actual damages are not hard to calculate—as I have calculated *supra*, Plaintiff is entitled to the

difference between the total principal and the amount of the principal Plaintiff converted into

shares post-default plus prejudgment interest from the date of default.  Further, the liquidated

damages provision in Article 3.16 is grossly disproportionate, adding nearly $121,000 to the

principal amount owed to Plaintiff for the express purpose of "coerc[ing] contract performance"

from Defendants and penalizing them.  *Coroware*, 2017 WL 3973921, at *3.  Therefore, Plaintiff

is prohibited from recovering under Articles 1.4(g) and 3.6, because they are both improper

liquidated damages provisions.

    As final note concerning Plaintiff's contractual damages award, I find that the revenue

that Plaintiff earned on its post-default conversions of Joey New York, Inc. stock should not in

any way affect the damages analysis.  As noted *supra*, since entering into the agreements,

Plaintiff has earned net proceeds of $301,023.27 from its conversions of Joey New York, Inc.

stock since the default date.  This figure is greater than the $241,600 that Plaintiff loaned

Defendants pursuant to the two Notes.  Broadly speaking, this would appear to conflict with the

general principle that compensatory damages for breach of contract "cannot put the non-

breaching party in a better financial position than they would have occupied but for the breach,"

nor can they give the non-breaching party a "windfall."  *State of N.Y. v. United Parcel Servs.*, 15-

cv-1136 (KBF), 2016 WL 4735368, at *10 (S.D.N.Y. Sept. 10, 2016) (internal quotation marks

omitted).  Nevertheless, my calculation of actual damages has already taken into account the

$90,181.50 of the principal that Plaintiff converted into shares after the default date.  Given that

the Notes provide Plaintiff with an unqualified right to convert any shares up to the amount due,

(*see* Doc 60-1 ¶¶ 1.1, 3.16; Doc. 60-3 ¶¶ 1.1, 3.16), the profits that Plaintiff made from the shares

that they chose to convert are irrelevant to the expectation damages calculation, which is

designed to put Plaintiff in the same position as if the contract had been completed.

As such, I find that Plaintiff is entitled to $151,418.50 in compensatory damages for its

contractual claims, plus prejudgment interest accruing at 24% per year from the date of default

up to the date of judgment.  (*See* Doc. 60-1, at 1; Doc. 60-3, at 1.)  Given that this damages

calculation constitutes the full balance of actual damages owed to Plaintiff, Plaintiff is not

permitted to convert any more shares after the date of this judgment.

### 3.  Specific Performance

Plaintiff argues that it is entitled to specific performance of the contract that would permit

it to "convert any damages pursuant to the Notes."  (Doc. 215 ¶¶ 632–39.)  Plaintiff argues that

"given Defendants' insolvency," any damages judgment that failed to allow Plaintiff to convert

into shares would be "worthless."  (*Id.* ¶ 639); *see also generally Alpha Capital Anstalt v.*

*Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 331 (S.D.N.Y. 2020) (noting that some courts have granted

"injunctive relief for non-delivery of convertible stock . . . where a defendant is insolvent or on

the brink of insolvency").  Specific performance is an "extraordinary equitable remedy," such

that "the party seeking relief must demonstrate that remedies at law are incomplete and

inadequate to accomplish substantial justice." *Lucente v. IBM*, 310 F.3d 243, 262 (2d Cir. 2002) (internal quotation marks omitted). "[S]pecific performance is not appropriate where the claim involves publicly traded stock." *Id.* (citation omitted); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 618 F. Supp. 2d 280, (S.D.N.Y. 2009) (same); *Iroquois Master Fund, Ltd. v. Quantum Fuel Sys. Techs. Worldwide, Inc.*, No. 13 Civ. 3860 (CM), 2014 WL 12776748, at *16 (S.D.N.Y. May 23, 2014) ("Where a plaintiff claims that a defendant breached a contract by failing to deliver warrants or publicly traded stock, money damages can adequately compensate the plaintiff for his loss."). Here, Joey New York, Inc. is still a publicly traded stock, (Tr. 659:23-24), which bars specific performance. Plaintiff does not explain why specific or injunctive relief would be an appropriate remedy in light of the fact that it does not contest that Joey New York, Inc. stock is still publicly traded, given that they made this same argument in this District two years ago and it failed for the same reason. *See EMA Fin., LLC v. AIM Exploration, Inc.*, No. 18 Civ. 145 (ER), 2019 WL 689237, at *13 (S.D.N.Y. Feb. 19, 2019). Consequently, Plaintiff's request for specific performance is denied.

### 4. Punitive Damages

Plaintiff requests also that I award punitive damages because Defendants' "conduct against [Plaintiff] was intentional, egregious, wanton, malicious, fraudulent, [and] shocking to the conscience." (Doc. 215 ¶¶ 621, 630.) Under New York law, "the standard for imposing punitive damages is a strict one and punitive damages will be awarded only in exceptional cases," where the conduct "manifest[s] spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wil[l]ful or wanton." *Marinaccio v. Town of Clarence*, 20 N.Y.3d 506, 511 (N.Y. 2013) (internal quotation marks omitted).

Plaintiff's punitive damages claim is meritless.  Plaintiff states that it is entitled to punitive damages because of the conduct of all three Individual Defendants, but references only the felony conviction of Richard Chancis.  (*See* Doc. 215 ¶¶ 621, 630.)  Plaintiff provides no explanation for why Joey Chancis and Roer should be liable for punitive damages.  Regardless, for the reasons detailed in my analysis of Plaintiff's piercing the corporate veil and fraudulent inducement claims, I find that the record does not support a finding that Defendants behaved in a way that was "intentional," "malicious," or "shocking to the conscience."

Plaintiff's claim for punitive damages is particularly unwarranted when considering Plaintiff's own conduct in this matter.  At the time the parties entered into the agreements, Plaintiff knew Joey New York, Inc. did not have a positive cash flow and was operating at a significant net loss, (Doc. 209-1, at 11; Tr. 681:4-9), was indebted to at least one other creditor, (*see* Doc. 180-19), and was therefore insolvent.  The terms of the Notes that Plaintiff negotiated were extremely onerous on Defendants and unforgiving in the event of default.  Taking advantage of the provisions in the Notes that allowed for it to convert shares at a discount at any time, (*see* Doc. 60-1 ¶¶ 1.1, 1.2, 3.16; Doc. 60-3 ¶¶ 1.1, 1.2, 3.16), Plaintiff aggressively sold shares of Joey New York, Inc. stock shortly after the company's default event, (*see* Doc. 207-1).  Not only did these conversions earn Plaintiff more than $300,000, (*see id.*)—considerably more than the total amount they lent Defendants in the first place—it is also reasonable to infer they also served to tank the price of Joey New York, Inc.'s stock, making it much harder for Defendants to make the company profitable and repay the loans, (*see generally* Tr. 666:4-16).  *See also Saint-Jean v. Emigrant Mortg. Co.*, 50 F. Supp. 3d 300, 313 (E.D.N.Y. 2014) (describing forms of "revelations of predatory lending" such as "steering and targeting of loans toward vulnerable groups," and "deceptive sales tactics, including false representations that

apparent problems or concerns would be healed later").  In other words, Plaintiff entered into the agreements at issue with its eyes more than wide open; indeed, an inference could be drawn that it knew exactly what consequence would be with regard to the Notes.  Although it could be argued—and Plaintiff certainly would argue—that these terms were justified for the risk it was taking by entering into the agreements with Defendants, that does not mean it is also entitled to punitive damages.  Therefore, it is clear that Plaintiff fails to provide any rationale for its claim for punitive damages.

### 5.  Attorneys' Fees

In my September 22, 2019 order in this case, I granted Plaintiff's motion for summary judgment as to attorneys' fees, costs, and expenses related to its contractual claims.  *EMA Fin., LLC*, 2019 WL 4600863, at *7.  Plaintiff concedes that it did not set out proof for its claim for attorneys' fees at trial, (*see* Doc. 216, at 29), nor has it provided any documentation in support of its claim for attorneys' fees.  In other words, I have "already determined defendant[s] [are] liable for fees, but . . . Plaintiff lacks sufficient information to render such an award on the current record."  *LG Capital Funding, LLC v. 5Barz Int'l*, 307 F. Supp. 3d at 104.  Plaintiff has not put forth "the amount of fees requested," "information regarding counsel's professional experience," or "contemporaneous billing records . . . [that] indicate the hourly rate billed and include information as to the work undertaken by counsel and the time spent on each task."  *Id.*  Absent any of this, I have "[n]one of the necessary information to determine a reasonable attorneys' fee."  *Id.*

Plaintiff instead argues that it "was not required to prove its attorneys' fees at trial." (Doc. 216, at 29.)  Plaintiff cites Federal Rule of Civil Procedure 54(d)(2)(B), which states that, "[u]nless a statute or court order provides otherwise," a motion for attorneys' fees must "be filed

no later than 14 days after entry of judgment."  As Plaintiff acknowledges, (Doc. 216, at 29–30),

however, Rule 54 applies only to attorneys' fees that are "ancillary relief for which a party must

make a motion to the court in order to recover" after judgment, *Hanley v. Herrill Bowling Corp.*,

No. 94 Civ. 4611(RPP), 1996 WL 79324, at *2 (S.D.N.Y. Feb. 23, 1996).  Rule 54 "does not

apply to fees recoverable as an element of damages pursuant to the terms of a contract."

*Compania Sud Americana de Vapores S.A. v. Glob. Terminal & Container Servs., LLC*, No. 09

Civ. 7890(PAC), 2013 WL 5754391, at *1 (S.D.N.Y. Oct. 23, 2013).  When I granted Plaintiff

judgment as to costs, expenses, and attorneys' fees, I did so only with regard to those "incurred

by Plaintiff in collecting any amount under the notes or for breach of any of the agreements."

*EMA Fin., LLC*, 2019 WL 4600863, at *7.  I found that Plaintiff was entitled to these fees

because the Notes state that "[i]f default is made in the payment of this Note, the Borrower shall

pay the Holder hereof costs of collection, including reasonable attorney's fees."  (Doc. 60-1 ¶

4.5; Doc. 60-3 ¶ 4.5.)  Therefore, the costs, expenses, and attorneys' fees related to the costs of

collection—i.e., the amounts for which I granted Plaintiff summary judgment—are not

"ancillary" to the Notes but instead recoverable based on the "terms" of the Notes themselves.

*Compania*, 2013 WL 5754391, at *1.  Plaintiff was therefore required to prove the fees at trial as

an element of damages.  *See Jones v. UNUM Life Ins. Co.*, 223 F.3d 130, 137 (2d Cir. 2000) (if

the "substantive law governing the action [i.e. contract law] provides for the recovery of such

fees as an element of damages to be proved at trial," claims for attorneys' fees may not be made

by motion pursuant to Rule 54); *Cumberland Farms, Inc. v. Lexico Enterprises, Inc.*, No. 10–cv–

4658 (ADS)(AKT), 2012 WL 526716, at *10 (E.D.N.Y. Feb. 16, 2012) (contractual recovery of

attorneys' fees "can only be recovered as an element of damages to be proved at trial" and Rule

54(d) is inapplicable); *Hanley,* 1996 WL 79324, at *2 ("Thus, attorneys' fees were recoverable

pursuant to 'the terms of a contract' to which Rule 54(d)(2)(B) does not apply." (citation omitted)).  As such, I find that Rule 54 does not apply to these attorneys' fees, costs, and expenses, and Plaintiff failed to prove and secure its award for these fees, cost, and expenses.

However, Plaintiff also states that it is entitled to attorneys' fees for other purposes, such as for trial, post-trial briefing, and a protective order.  (*See* Doc. 216, at 30.)  I find that these potential attorneys' fees are ancillary to the Notes, and therefore Plaintiff may file a motion for attorneys' fees within fourteen (14) days of judgment related to these fees alone.  Plaintiff is warned that I will not consider any motion for fees related to costs of collection given that, as noted *supra*, these are provided for by the Notes themselves and therefore do not qualify under Rule 54(d)(2)(B).

### F.  *Broker-Dealer Affirmative Defense*

On June 9, 2021, I denied Plaintiff's motion to prevent Defendants from asserting a broker-dealer defense at trial and in their post-trial briefing on grounds that Defendants failed to raise the defense in their answer or amended answer.  (Doc. 164.)  Plaintiff appears to invite me to reconsider this ruling, arguing that Defendants have waived this argument.  (Doc. 216, at 46.) I decline to do so.  As I stated in my June 9, 2021 ruling, I believe that Plaintiff cannot establish any actual prejudice from Defendants raising this argument.  (*See* Doc. 164, at 5–6.)

Defendants argue as an affirmative defense that the agreements between the parties at issue here are void pursuant to section 29(b) of the Exchange Act, 15 U.S.C. § 78cc, because Plaintiff was not registered as a broker-dealer.  (*See* Doc. 214, at 3.)  Defendants argue that Plaintiff should be considered a "dealer" as contemplated under the statute, and therefore its failure to register as a dealer renders these agreements unenforceable.  (*See id.* at 11–14.)

This argument is unconvincing in light of recent and very clear case law from this District on this precise issue, which holds that absent language in the agreements requiring Plaintiff to register as a broker-dealer, this affirmative defense cannot succeed. *See Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) ("Vystar contends that in entering and performing the contracts—in particular, the act of converting shares at a below-market rate and subsequently selling the shares—Ema acted as a broker-dealer and because Ema is not registered as a broker-dealer, Ema has violated the Exchange Act.  The flaw in Vystar's argument, however, is that it does not identify a provision in the contracts that obligates Ema to act as a broker-dealer."); *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, No. 17 Civ. 4006 (RJS), 2018 WL 6547160, at *15 (S.D.N.Y. Sept. 28, 2018) ("Although it is an open question on this record whether LG should have registered as a 'dealer' with the SEC—and though LG may face substantial exposure in a suit by the SEC if it should have registered but did not—the Court concludes that even if LG should have registered, nothing in the Note or the SPA indicates that those contracts 'could not have been legally performed' because LG failed to do so."); *Yi v. GTV Media Grp. Inc.*, No. 21 CIV. 2669 (VM), 2021 WL 2535528, at *5 (S.D.N.Y. June 18, 2021) (in order for a contract to be unlawful "based on the defendant's status as an unregistered broker-dealer in violation of the Exchange Act, the contract . . . must require the defendant to register as a broker-dealer.").  Put simply, to succeed on this affirmative defense "[i]n this District," it is "essential" to identify a provision in the agreement requiring Plaintiff to register as a broker-dealer.  *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020).

Unable to identify a provision in any of the agreements between the parties that requires Plaintiff to register as a broker-dealer, Defendants instead argue that I should ignore the clearly established law in this District and adopt the approach taken by other circuits or district courts in

this Circuit.  However, given that there have been at least four decisions issued in this District in fewer than three years on this very issue, I would need an extraordinary reason to depart from the law of this District, and I find none here.  Therefore, I reject Defendants' broker-dealer affirmative defense.

### G. *Ancillary Issues*

Finally, there are some miscellaneous issues that I must decide before entering judgment. First, Plaintiff asks that I decline to consider any testimony from Defendants that was based on documents that Defendants failed to produce, (*see* Doc. 216, at 15), including testimony about personal loans Defendants made to the corporate entitles, (*see id.* at 20–21).  This weak argument suggests that because I found that Defendants could not introduce several exhibits on the eve of trial, any testimony on issues related those documents—including testimony related to Plaintiff's loans to the company—should be inadmissible.  This is entirely without merit.  The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge.  *See New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 425 (S.D.N.Y. 2000) (citing Fed. R. Evid. 602).  Absent an argument that this testimony was improper under the Best Evidence Rule, *see* Fed. R. Evid. 1002—an argument that Plaintiff does not make and has no application here—there is no reason why a witness cannot testify as to information within their personal knowledge, even if documentation related to that testimony is not in the record.  Plaintiff alternatively argues that I should not credit Defendants' testimony about their personal loans to the company because that testimony was "conclusory and self-serving" and unsupported by documentary evidence.  (*See* Doc. 216, at 17–18.)  This argument, which appears to go to the weight of the evidence as opposed to its admissibility, is also misguided.  Defendants gave consistent testimony, under oath and penalty of perjury, as it

pertained to their personal loans to the company and their finances.  To an extent that testimony

was corroborated by certain public filings that referenced the existence of promissory notes to

Roer and Joey Chancis.  (Doc. 209-1, at 9.)  Having said that, I do agree with Plaintiff that this

testimony should be accorded less weight without additional supporting documentary evidence,

and I have factored that into my analysis.  However, Plaintiff does not account for the fact that it

has the burden to prove its affirmative case, and it failed to produce more than a shred of

evidence to suggest that the Individual Defendants acted in an effort to enrich themselves at

Plaintiff's expense.  Regardless, Plaintiff specifically asked me to ignore this evidence with

regard to its constructive fraudulent conveyance claim, (*see id.* at 17); I agree that this evidence

is not relevant to that claim and granted judgment to Plaintiff as to liability on this claim.

Relatedly, Plaintiff asks that I decline to consider the testimony of Joey Chancis because

of her purported reliance on notes during her testimony.  (*See id.* at 44.)  Plaintiff claims that

Joey Chancis referred to notes related to the documents that I excluded from trial and which she

failed to turn over to Plaintiff.  The authority that Plaintiff relies on, *Lava Trading, Inc. v.*

*Hartford Fire Insurance. Co.*, No. 03 Civ.7037 PKC MHD, 2005 WL 459267 (S.D.N.Y. Feb. 24,

2005), concerns materials that a party tried to introduce into the record as exhibits, not materials

that a party merely used as notes.  *Id.* at *15.  Given that I am "obligated to afford a special

solicitude to pro se litigants," who "deserve more lenient treatment than those represented by

counsel" because they "generally lack[] both legal training and experience," *Tracy v.*

*Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), I find that Joey Chancis's occasional reliance on

notes does not warrant the highly prejudicial step of striking her testimony.  Further, I add that

Joey Chancis used these notes only for the purpose of trying to refresh her own memory with

regard to certain charges or withdrawals that she made on corporate accounts.  (*See* Tr. 395:6-

396:24.)  This testimony was mostly useful for Plaintiff, which it cited itself in support of its

arguments for fraudulent conveyance and piercing the corporate veil.  Thus, I find that any

misconduct by Joey Chancis in relying on these notes was not just in good faith, but harmless.

Second, Plaintiff requests that I draw an adverse inference based on Defendants' failure

to produce documents related to their transfers.  (*See* Doc. 216, at 18).  An adverse inference is a

"severe sanction[]."  *De Vos v. Lee*, No. 07-CV-804 (JBW), 2008 WL 2946010, at *2 (E.D.N.Y.

July 29, 2008).  Adverse inferences are thus disfavored when parties have "pro se status," lack

"substantial experience litigating civil suits," and were unaware "that Plaintiff[] would file a

sanctions motion against [them] if [they] failed to comply with their discovery obligations."  *City

of Almaty, Kaz. V. Ablyazov*, No. 1:15-CV-05345 (AJN) (KHP), 2019 WL 3281326, at *7

(S.D.N.Y. July 3, 2019).  Plaintiff concedes, (*see* Doc. 216, at 19), that in order to secure an

adverse inference against Defendants, it is required to show "that the [Defendants] that failed to

timely produce the evidence had a culpable state of mind," *Scantibodies Laboratory, Inc. v.

Church & Dwight Co., Inc.*, No. 14cv2275 (JGK) (DF), 2016 WL 11271874, at *17 (S.D.N.Y.

Nov. 4, 2016) (internal quotation marks omitted), *report and recommendation adopted*, 2017

WL 605303 (S.D.N.Y. Feb. 15, 2017).  Plaintiff does not even try to argue that any of the

Individual Defendants had a culpable state of mind with regard to their non-disclosure of

documents.  As such, particularly given Defendants' pro se status, an adverse inference would be

inappropriate here.

Third, Plaintiff asks that I determine that it was improper to permit Defendants to issue

subpoenas during trial.  (*See* Doc. 216, at 33).  As I explained at trial, I believe that this trial

subpoena was necessary because no discovery was taken of Roer after he was added to the case,

and therefore he had no reason or opportunity to produce documentation that would substantiate

his testimony about his financial accounting.  (*See* Tr. 300:16-305:18.)  Nevertheless, as Plaintiff

will note, the only document produced in response to that trial subpoena on which I relied in this

Opinion & Order was a promissory note indicating that Roer is owed $1.5 million from Joey

New York, Inc. based on personal investments he made in the company.  (Tr. 777:5-7, 782:21-

783:18.)  This promissory note is entirely consistent with unrebutted trial testimony that Roer

invested about $1.5 million of his personal money into the company, and the public filings.  (Tr.

204:12-15, 776:10-15; Doc. 209-1, at 9.)  As such, even if this trial subpoena were improper, any

error was harmless because I barely relied on any materials produced in response to that

subpoena.  My decision in this Opinion & Order is supported even without considering any

materials produced in response to the trial subpoena at issue.

### IV.   <u>Conclusion</u>

Judgment is GRANTED in favor of Plaintiff as to breach of contract, breach of guaranty,

and constructive fraudulent conveyance.

Judgment is DENIED as to fraudulent inducement and actual fraudulent conveyance, and

Plaintiff is not permitted to pierce the corporate veil.

Plaintiff is awarded $151,418.50 for its contractual claims, plus prejudgment interest

accruing at 24% per year from July 26, 2017.  The Clerk's office is directed to enter judgment to

this effect.

Plaintiff's requests for specific performance and punitive damages are DENIED.

To the extent Plaintiff seeks to file a motion for costs, expenses, and attorneys' fees, it

must do so within fourteen (14) days of entry of judgment.  Plaintiff is not permitted to seek

costs, expenses, or attorneys' fees related to the costs of collection.

The Clerk of Court is directed to terminate any open motions, enter judgment in

accordance with this Opinion & Order, mail a copy of this Opinion & Order to pro se

Defendants, and close this case.

SO ORDERED.

Dated: February 1, 2022
        New York, New York

Vernon S. Broderick
United States District Judge